132

## STANDARD–KNAPP CORPORATION v. UNITED STATES.

### No. 46282.

Court of Claims.

March 3, 1947.

W. B. Morton, of New York City (Pennie, Edmonds, Morton & Barrows, of Washington, D. C., on the brief), for plaintiff.

Grover C. Sherrod, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

On April 27, 1942, plaintiff and defendant entered into a written contract, after discussions and negotiations which began in August 1941, for the manufacture by plaintiff of a packaging machine designed to automatically pack 50 rounds of .30 caliber small arms ammunition in specified corrugated Kraft paper cartons and seal such cartons. Plaintiff had been engaged in the business of designing and manufacturing automatic packaging machines for a number of years, and while the general principle of operation of this proposed machine and a number of the results to be produced by its various units and mechanisms were not new, the design of the corrugated Kraft paperboard carton, approximately 9½" by 12¾", with two rows of corrugations or flutes into which the ammunition was to be automatically inserted, and the final result to be accomplished, was new in the ammunition packaging field.

The defendant's officials of the Ordnance Department, and at the Frankford Arsenal, had asked plaintiff to make an investigation and study of possible improvements in the existing type and style of ammunition carton and methods of packaging small arms ammunition. At that time small arms ammunition was being packed by hand at the Frankford Arsenal. However, plaintiff had manufactured a machine for automatically loading machine gun ammunition into fabric machine gun belts. Plaintiff's investigation disclosed that there were a number of companies engaged in the business of manufacturing paper corrugating machines and that there were also a num-

ber of firms engaged in manufacturing and selling corrugated paper. Plaintiff also found that corrugated paper manufacturers were equipped to make corrugated paper having corrugations or flutes that would be suitable to receive and hold .30 caliber ammunition to be packaged in individual paper cartons of a suitable size. For the purpose of further discussions samples of such corrugations were obtained by plaintiff and submitted to the Commanding Officer, at the Arsenal, and to the Ordnance Office at Washington. The Arsenal set in motion plans to secure the necessary funds for the purchase of suitable equipment to make the paper cartons and to load ammunition therein, the plaintiff, in conversation with Arsenal officials, having stated that it would undertake the manufacture of a machine to load and seal the cartons. As a result plaintiff wrote the Arsenal the letters of December 29 and 30, 1941, quoted in finding 6, quoting a price of $9,500 for an automatic packing and sealing machine. In further discussions defendant asked plaintiff if it would furnish all other units or machines necessary to make the corrugated paper for the cartons of suitable paper material and to print certain desired information thereon, since all phases of the project were related and it would be easier for the Arsenal to handle the matter in that way instead of by separate contracts. Plaintiff at first objected but finally agreed inasmuch as the other units desired by defendant, and necessary to make a complete machine, were more or less standard equipment which could be acquired from the manufacturers thereof by subcontracts.

As a result of these discussions and negotiations, which were followed by plaintiff's letter of February 5, 1942 (finding 7), quoting a price of $19,000 f. o. b. Portland, Conn., later changed to $19,150 f. o. b. Philadelphia, defendant's officials at the Arsenal drafted certain specifications, dated March 18, 1942, which, as amended in certain respects, together with a drawing of the carton, became the contract between the parties upon the issuance of a purchase order on April 27, 1942, by the Commanding Officer of the Frankford Arsenal, as contracting officer. The material portions of the specifications are set out in finding 10. In the negotiations, in plaintiff's proposal of February 5, and in the contract and drawing, it was understood and agreed that the complete machine and all its parts would be designed and constructed to use and be operated with 9 point and 16 point Kraft paperboard. This was the best grade of paperboard and was to be .009 and .016 inch in thickness, the corrugations or flutes being .009 Kraft paper, and the dividing strip between the two rows of flutes and the carton proper being .016 Kraft paper.

The contract provided for delivery of the complete machine by August 18, 1942. It was not delivered until February 11, 1943, but before, as well as at the time of delivery, the contracting officer impliedly extended the time and no objection was made because of late delivery when the machine was received by defendant and installed at the Arsenal by defendant's employees under the supervision of the plaintiff's service man. The contract in paragraph 1 of the "Additional Provisions" to the specifications, provided for "Termination for Convenience of the Government" before completion of the equipment and for the payment of certain sums in such event, and in paragraph 2 provided that the Government might terminate "the right of the contractor to proceed with delivery" after having given to the contractor written notice "of its intention to terminate." Defendant, however, took no action under either of these provisions prior to or at the time of delivery.

On October 6, 1943, and again on November 1, 1943, defendant rejected the entire machine and cancelled the contract on the alleged ground of nonperformance of the machine in accordance with the requirements of the contract (findings 39 and 41), and refused to pay any part of the contract price of $19,150. The first notice of rejection was sent to plaintiff by the Foreman of the Production Division of the Arsenal and, after plaintiff's protest in writing (finding 40), the contracting officer signed a letter of rejection and cancellation which had been prepared in the Legal Department of the Frankford Arsenal (finding 41).

The first issue presented as a result of this action is whether the defendant was justified in rejecting the machine and can-

celling the contract under the terms and conditions thereof, and on the facts established by the record the answer turns on the proper interpretation of the intention and meaning of paragraph 1 of Section VIII of the contract as to who should supply the 9 point and 16 point Kraft paper material for the "operating test after installation" of the machine. This paragraph stated that "The equipment will be given an operating test after installation to insure that the requirements of these specifications are being met" (finding 10). Paragraph 10 of Section V provided that "Equipment shall be furnished complete and ready for operation in the location where now used, * * *. It shall likewise be necessary for Frankford Arsenal to supply all necessary labor to position the equipment properly. The contractor shall supply competent supervisory labor for installation of the equipment and to instruct your [Government] operators as to its correct use." Paragraph 3 of Section VIII provided that "Final inspection and acceptance will be at the point of delivery."

The ordinary and natural meaning of these provisions would seem to be that the defendant was the one who was to give the equipment an operating test after installation, for the purpose of determining whether in the construction of the machine the requirements of the specifications had been met, and that it was, therefore, the duty and obligation of defendant to supply all material, such as labor, ammunition, paper, electric current, steam, etc., necessary for such operating test, since all such services, material, etc., would be necessary for the continued use of the machine. This was the interpretation which the parties placed on the contract at the time the machine was delivered and installed. Prior to delivery of the machine at the Frankford Arsenal and at all times thereafter, plaintiff took the position that it was the duty of defendant under the contract to supply the Kraft paper specified in the contract, for the operating test by defendant's employees after installation. The officials of the Frankford Arsenal agreed and attempted to procure and supply such paper but found that, because of the shortage of this grade of paper, they were unable to procure it on the market. In addition, defendant furnished the employees necessary to give the machine an operating test after installation.

Prior to the trial of this case no one representing the Government took the position that the contract required plaintiff to supply the paper material for the operating test after installation. (See defendant's letter of November 1, 1943, finding 41.)

Instead of furnishing .009 and .016 Kraft paper, the defendant procured and supplied .016 chipboard paper material (finding 27), with which, as plaintiff advised the Arsenal at the time, the machine would not operate. By reason of the inability of defendant to obtain the Kraft paper, there was never an operating test of the machine after installation, under the terms of the contract and in accordance with the intent and meaning of the provisions thereof. However, the greater weight of the credible evidence of record shows that all the units of the machine were adequately and fully tested prior to delivery and that they operated properly and in accordance with the requirements of the contract. The evidence is also sufficient to show that the entire machine would have properly functioned and operated in accordance with the contract requirements with .009 and .016 Kraft paper. The corrugating unit of the machine had been tested and after completion had manufactured 1,500 feet of corrugated Kraft paper in conformity with the specifications and drawing. This was sufficient paper for approximately 1,500 cartons. This corrugated paper was all used in testing the feeding, cut-off, packaging and printing units of the complete machine at plaintiff's Portland plant. The proof shows that some samples of loaded and sealed cartons made from this paper were furnished to the Arsenal.

Counsel for defendant point to paragraph 2 of Section VIII of the contract, which related entirely to a preliminary factory test, and say that since under the whole contract the responsibility for the proper functioning of the machine and the results to be produced thereby rested upon plaintiff, it had the obligation of furnishing the necessary and proper paper material for the operating test after installation, and since

it did not do this it failed fully to perform its part of the contract. Plaintiff was responsible if, upon the operating test by defendant's employees under the supervision of plaintiff after installation, the machine did not function properly and produce the required result with the use of the specified Kraft paper, but, as we have found, it was not responsible for failure of any part of the machine to operate with .016 chipboard paper material.

■ The evidence shows and we have found as a fact that plaintiff performed its part of the contract. The defendant was, therefore, without authority under the contract to reject the machine and refuse to pay plaintiff the contract price of $19,150.

■ It is not necessary to discuss in detail the six findings set forth in the rejection letter of November 1, 1943, as the grounds for the conclusion of the contracting officer that "the rejection was based solely upon the failure of your company to manufacture the machine in accordance with [the] contract." All of the matters mentioned in these findings, except the sixth, had to do with voluntary experiments carried on by plaintiff with the knowledge of the Arsenal officials, not under the contract nor in connection with an operating test for the purpose of acceptance, but solely for the purpose of ascertaining whether it would be possible to so reconstruct various portions of the machine as to make it work with the chipboard paper material supplied by defendant. Plaintiff at no time expressly or impliedly agreed to make the machine operate with that material, nor was it authorized or ordered by the contracting officer to make such changes and additions. Defendant at no time advised plaintiff that any of these experimental runs with chipboard would be regarded or treated as a contract operating test. The sixth finding that the machine occupied a space of 14′ 9″ x 34′, whereas the specifications stated that the dimensions of the machine should not exceed 10′ x 38′, cannot be treated on the evidence as even a technical ground for rejection. The legal department and the contracting officer evidently overlooked the fact that prior to completion and delivery of the machine the Command-

ing Officer of the Arsenal had acquiesced in plaintiff's revised floor plan, showing that it would be necessary for the dimensions of the machine to be 36′ 4″ in length by 15′ 1″ in width. The revised plan had been delivered to the contracting officer on October 10, 1942. The over-all space actually occupied by the completed machine was less than that shown on the revised drawing, which had been accepted by the contracting officer without objection. At the time of delivery and installation no objection was made with reference to the space occupied by the machine. The objection first made one year after the revised drawing was submitted, and 8 months after delivery, came too late.

Plaintiff is entitled to recover the contract price of $19,150.

■ In addition to the contract price plaintiff claims and seeks to recover $4,839.-76, representing its total expenditures, including overhead, in attempting to change and reconstruct various operating parts of the machine with the view of ascertaining whether it would be possible to make the machine operate with chipboard. This was not a contract requirement and the proof does not show that this additional work and expense were expressly or impliedly ordered or authorized by anyone having authority to bind the United States. The fact that the subordinate officers and engineers of the Arsenal knew of this experimental work and the costs and expenses incurred, is not sufficient to entitle plaintiff to recover such costs. Plaintiff did not take up with the Commanding Officer the matter of attempting by changes to make the machine work with chipboard but proceeded therewith on its own volition and with a desire to aid the defendant in every possible way. While the fact is not important in connection with the claim on this item, it appears that if plaintiff had had a little time to continue its experiments it probably would have been able to change and reconstruct various operating parts in such way that the machine would have operated to make and load cartons of chipboard material, but the rate of production would have been less and it would have been practically impossible to make a carton from chipboard that would have been

as satisfactory as one made from Kraft paper.

Plaintiff is not entitled to recover on this item of its claim.

Judgment will be entered in favor of plaintiff for $19,150. It is so ordered.

MADDEN, JONES, and WHITAKER, Judges, concur.

WHALEY, Chief Justice, took no part in the decision of this case.